**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

NICOLE WASSER,

                              Plaintiff,

              v.                                              No. 3:15-CV-273

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**


**APPEARANCES:**                              **OF COUNSEL:**

Lachman & Gorton                              PETER A. GORTON, ESQ.
Attorneys for Plaintiff
1500 E. Main Street
P.O. Box 89
Endicott, New York 13761-0089

Social Security Administration,              DAVID L. BROWN, ESQ.
Office of General Counsel                    Special Assistant U.S. Attorney
Attorneys for Defendant
26 Federal Plaza - Room 3904
New York, New York 10278

### MEMORANDUM-DECISION AND ORDER

        Plaintiff Nicole Wasser ("Wasser") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying her application for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under the Social Security Act.  Wasser moves for a finding of disability, and

the Commissioner cross-moves for a judgment on the pleadings.  Dkt. Nos. 16, 17.

## I.  Background

## A.  Procedural History

Wasser, born on January 25, 1974, applied for DIB and SSI on June 6, 2012, alleging an onset date of April 25, 2012.  T.[1] 158-69.  The applications were denied on August 29, 2012.  Id. at 80-85.  Wasser requested a hearing before an Administrative Law Judge ("ALJ").  Id. at 86.  A hearing was held before ALJ Marie Greener on August 13, 2013 in Syracuse, New York.  Id. at 34-51 (transcript of oral hearing).  In a decision dated November 1, 2013, ALJ Greener held that Wasser was not entitled to disability benefits.  Id. at 8-23.  Wasser timely filed a request for review, and on February 12, 2015, the Appeals Council denied Wasser's request, making the ALJ's findings the final decision of the Commissioner.  Id. at 1-7.

## B.  Facts

## 1.  Wasser's Testimony

Wasser alleged that she was disabled due to degenerative disc disease, fused discs in her back, spondylosis, arthritis of the back, hips, and neck, and a right wrist fusion.  T. 186.  She suffered from pain primarily in her back, from the neck down.  Id. at 43.

At the time of the hearing, Wasser stood at five feet, four inches tall, and weighed approximately 210 pounds.  T. 38.  She lived with her spouse, her children, and her granddaughter.  Id.  She drove occasionally.  Id.

---

[1] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  See Dkt. No. 10.

Wasser last worked in April 2012.  T. 39.  The last full-time job she held was as a branch manager for a temporary staffing agency.  Id.  In that position, she would recruit prospective employees for other employers.  Id.  The job required her to sit at a desk half of the time, and perform "field work" half of the time—which included meeting prospective employees outside the office, and performing on-site evaluations.  Id.  Occasionally, the job required her to lift up to fifty pounds.  Id.  She held this job for approximately five years.  Id. at 39-40.  Prior to her job as a branch manager, she worked as an assistant manager at Taco Bell for three years.  Id. at 40.  This job required her to be on her feet primarily, unless she was making the schedule, or giving an evaluation.  Id.  This job also required heavy lifting.  Id. at 40-41.  Prior to her job at Taco Bell, she worked as a unit manager at a collection agency.  Id. at 41.  This job required her to be on her feet half the workday, and sitting at a desk for half of the workday.  Id. at 41-42.

Wasser testified that she can no longer work because of the pain that she experiences daily.  T. 43.  She stated that she frequently needs to rest, and recline with her feet up.  Id.  Pain medication leaves her feeling groggy.  Id.  Her back pain occured mostly in the center of her lower back, but she also experienced spasms between her shoulders.  Id.  She used an at-home traction machine and a TENS[2] machine for pain management.  Id.  In addition, she had prescriptions for Kadian (morphine), Vicodin, Tizanidine, and Flexeril.  Id.  Although, Wasser admitted that she does not take the prescription medications as instructed because they maker her feel groggy and "unable to function."  Id.  She stated that

---

[2]  "TENS" stands for transcutaneous electrical nerve stimulation.  TENS stimulates neural tissues by applying a small electrical current to the skin.  THE MERCK MANUAL 1629 (Robert S. Porter, M.D. & Justin L. Kaplan, M.D. eds., 19th ed. 2011).

the prescriptions provided some relief.  Id.  She also stated that the prescription medications impeded her ability to concentrate.  Id. at 50.  Wasser completed two rounds of physical therapy, but stated that they did not help her condition.  Id. at 44.

Wasser was examined by an orthopedist, Dr. Siegel, for her neck pain.  T. 44.  Dr. Siegel did not recommend surgery, but found degenerative discs after conducting an MRI. Id.  Wasser had injections in her spine and tail bone, including injections that she received after her back surgery.  Id. at 45.  She stated that they only helped her condition for a couple of days, at most.  Id.

The pain that Wasser experienced varied from day to day, ranging from "dull" to "intense."  T. 45.  Household chores, prolonged standing or sitting, and prolonged driving exacerbated her pain.  Id.  She stated that she had "bad" days four to five days per week. Id. at 48.  She must transition from standing to sitting, or vice versa, every ten or fifteen minutes.  Id. at 49.  She had only driven once in the past month, and stated that she must stop for a break if she drives for more than twenty minutes.  Id.

Wasser testified that, on a daily basis, she would woke up and laid on an ice pack for forty-five minutes to relieve back stiffness.  T. 46.  She then got up and assigned household chores to her children, and then sat and watched the television.  Id.  She stated that she would try to move around, and would sit both inside and outside.  Id.  She would also go to the store, and cook dinner with the help of her children.  Id.  Her husband drove her to her appointments.  Id.  She used to enjoy playing darts.  Id. at 47.

## 2.  Medical Opinions

### a. Dr. Musthaq Sheikh, M.D. - Consultative Examiner

Dr. Sheikh performed a consultative examination of Wasser on July 31, 2012. T. 294-307. At that time, Wasser complained of low back, neck, left shoulder, arm, and right wrist pain, as well as arthritic pain in her right hip and knee. Id. at 294. Wasser stated that her low back pain was "persistent" and rated the pain as a four out of ten, elevating to a ten out of ten when she stood or sat for prolonged periods of time. Id. She also reported neck stiffness. Id. Dr. Sheikh noted that x-rays revealed degenerative joint disease. Id. Wasser further reported sharp left shoulder pain, rated as a three or four out of ten, but sometimes elevated to a ten out of ten. Id. Her right wrist ached, especially in cold weather. Id. at 295. She reported that both left and right hips and knees ached, but the right side was worse. Id. The pain worsened with activity. Id. At the time of the examination, Wasser was taking Hydrocodone, Tizanidine, and Cyclobenzaprine. Id.

Wasser reported that she cooked two to three per week with help. T. 295. She cleaned one to two times per week with help. Id. She did not do laundry because she could not bend. Id. She shopped once per week with her husband. Id. She showered three to four times per week with assistance. Id. She had a shower chair. Id. at 295-96. She needed help dressing herself. Id. at 296. She watched the television, listened to the radio, read, and socialized. Id.

Dr. Sheikh observed that Wasser's gait was "slow and wide-based." T. 296. She was unable to walk on heels and toes due to her back pain. Id. Her stance was normal, but she could only squat to ten percent. Id. She required her husband's assistance to change for the examination, get on and off the exam table, and rise from her chair. Id.

Dr. Sheikh's musculoskeletal examination showed that Wasser had limited flexion and extension of the cervical spine. T. 297. There was tenderness over C5 to C7, as well as T6 to T7. Id. He observed no scoliosis or kyphosis, but there was lordosis of the lumbar spine. Wasser also exhibited limited flexion and extension of the lumbar spine. Id. There was tenderness over L2 to L5. Id. Wasser had full range of motion of her right shoulder, elbows, forearms, and wrists bilaterally, but limited range of motion of her left shoulder. Id. She also had full range of motion of her left knee and both ankles. Id. Wasser's ranges of motion of her right hip and knee were limited. Id. Her joints were stable, and Dr. Sheikh noted no redness. swelling, effusion, or trigger points. Id.

Dr. Sheikh's neurological examination was normal, except that Wasser exhibited decreased sensation over the right foot, and over the left forearm and hand. T. 297. Strength was normal in Wasser's upper and lower extremities. Id. Right hand and finger dexterity and grip strength were normal. Id. at 298. But grip strength was diminished to a four out of five in Wasser's left hand, and she had "a little bit of trouble tying, zipping, and buttoning with the left hand." Id.

Dr. Sheikh noted that Wasser's prognosis was "guarded" and offered the following Medical Source Statement ("MSS"): "She has marked limitation in bending, walking, carrying, lifting, and squatting. She has mild limitation for fine motor activity with the left hand." T. 298.

### b. Dr. Michael Wasco, M.D. - Internist

Dr. Wasco completed a physician's statement on January 9, 2013. T. 389-92. As to Wasser's level of physical impairment, Dr. Wasco noted that Wasser had a "severe

limitation of functional capacity" and was incapable of sedentary work. Id. at 389. He noted that her daily activities were limited by pain. Id. When asked to identify Wasser's current level of work capacity, Dr. Wasco noted that Wasser was totally disabled, and did not have the functional capacity to work full time. Id. at 391. He noted that the reasons that Wasser did not have the functional capacity to work were her chronic back pain, and numbness in her lower extremities when walking. Id. In an eight-hour workday, Dr. Wasco opined that Wasser would be able to sit continuously, and stand continuously, for half an hour each. Id. He further noted that she would only be able to walk one block, slowly. Id.

### c. Dr. Sajid Khan, M.D. - Pain Management Specialist

On July 10, 2013, Dr. Khan completed a questionnaire regarding Wasser's functional capacity. T. 480-82. Dr. Khan noted that Wasser would require "complete freedom to rest frequently without restriction." Id. at 481. He opined that, even if she were to attempt sedentary work, Wasser would be absent from her job four to six times per month due to her medical condition. Id. The side effects of Wasser's pain medication—fatigue and dizziness—would moderately impact her ability to concentrate and sustain work pace. Id. Dr. Khan opined that Wasser could sit for a total of four hours in an eight-hour workday, and would need to change positions once every hour. Id. at 482. He further noted that she could should not lift more than ten pounds, and could only lift over five pounds for up to three hours per day. Id. His opinion covered the time period of March 29, 2012 through May 29, 2013. Id.

### d. Dr. Daniel Galyon - Neurosurgeon[3]

On March 22, 2012, Wasser was examined by Dr. Galyon. T. 264-65. During that examination, Wasser reported that she was experiencing "quite a bit of back pain, stiffnes, and radiation into the right leg with chronic numbness along the foot." Id. at 264. Dr. Galyon noted that she had an "obvious problem" evident from her MRI results. Id. Dr. Galyon noted that Wasser had "a lytic deformity of L5 with degenerative change at the facet complexes and pars region." Id. He also noted "mild encroachment of the neural canal." Id. He further noted a "slight slip of L5 on S1," and "some degree of mild facet hypertrophy" on L4-L5, but that the disc looked fairly normal. Id. Dr. Galyon discussed conservative treatment with Wasser, including therapy, pars injections, and pain management, but noted that she may eventually require surgery. Id. at 265. On April 12, 2012, Wasser presented to Dr. Galyon complaining of continuing pain, and Dr. Galyon recommended surgery. Id. at 263.

Dr. Galyon performed back surgery on Wasser on April 25, 2012. T 242-50. On May 8, 2012, Wasser reported that her post-operative condition was worsening, and rated her pain as a seven out of ten. Id. at 254.

On May 10, 2012, Wasser reported that her pain score was a five out of ten. T. 252. She was also using an assistive device. Id. Wasser's range of motion was "acceptable" given her post-operative condition. Id. On May 23, 2012, Wasser reported that her post-operative condition was worsening, and that she was experiencing pain rated at a six out of

---

[3] Although the ALJ noted in her decision that she gave little weight to Dr. Galyon's "opinion," the Court notes that there is no MSS or questionnaire completed by Dr. Galyon in the record. T. 16. As such, the Court summarizes below Dr. Galyon's medical records of his examinations of Wasser.

ten.  Id. at 250.  Wasser was taking medication for the pain and her response to the pain medication was "fair."  Id.  On June 5, 2012, Wasser was doing "reasonably well."  Id. at 256.  She had relief of radiating pain in her right leg, and the "expected amount" of back pain and stiffness.  Id.  Dr. Galyon noted that her x-rays showed "satisfactory alignment and appearance of grafting and hardware, L4 through S1."  Id.  He also noted that Wasser would continue with physical therapy and stretching in order to wean herself off the brace, but that she was not ready to return to work.  Id.

On July 10, 2012, Wasser reported that her post-operative status was improving.  T. 403.  She was experiencing less pain, less frequently than before.  Id.  Dr. Galyon noted that she was "doing nicely" and that her x-rays "look[ed] stable."  Id.  On August 21, 2012, Dr. Galyon noted that Wasser was doing "rather well" postoperatively.  Id. at 405.  He noted that she still had "proximal based discomfort and some mild component of neck pain," along with "reduced strength and sensation distally in her lower extremities."  Id.  Wasser's x-rays showed "excellent alignment and positioning of graft and hardware L4-S1."  Id.  Dr. Galyon noted that Wasser was still taking hydrocodone, and he recommended that she go to the pain clinic to find alternatives to managing her pain.  Id.  He also recommended physical therapy.  Id.  Lastly, he noted that an MRI of her neck did not show any issues.  Id.  Dr. Galyon noted that Wasser was "still disabled" but that he anticipated her improvement so that she could eventually return to work.  Id.

On October 2, 2012, Dr. Galyon observed that Wasser experienced "a moderate amount of proximal based discomfort in the low back."  T. 408.  The pain worsened with activities.  Id.  She did not exhibit any radiating pain down her legs, but she could only forward flex to sixty degrees, and experienced increasing tightness.  Id.  A straight leg raise

was "incontinent with her back pain only," but she showed good strength and sensation.  Id.

On December 4, 2012, Wasser reported that her pain fluctuated, but occurred persistently.  T. 410.  Wasser described the pain as aching and throbbing.  Id.  The pain was exacerbated by laying down, sitting, standing, and walking.  Id.  Wasser also reported pain radiating to the hips bilaterally, as well as numbness in her lower extremities and tingling in her legs.  Id.  The pain was relieved by heat, ice, pain medication, and use of her TENS machine.  Id.  Upon physical examination, her lumbar range of motion was limited by pain, but her bilateral lower extension showed good strength and sensation.  Id. at 411.  Her balance and gait were intact.  Id.  Her x-rays appeared stable.  Id. at 412.  Although Wasser's MRI from this date showed that her L4 to S1 fusion was stable, there was also "persistent slight anterolisthesis of L5-S1."  Id. at  419.  It was further noted that a urine screen was positive for THC and cocaine.  Id. at 412.

On February 11, 2013, Wasser's pain was stable, but persistent in her lower back. T. 413.  She also reported pain radiating to her left and right ankles, calves, and thighs.  Id. Upon physical examination, Dr. Galyon noted that Wasser's pain was "very positional in nature" and "worse with standing and walking."  Id.  Her wound had healed nicely but she had mild tenderness in the upper gluteal region.  Id.  She could forward flex to seventy degrees, and extend to twenty degrees.  Id.  She exhibited good neurologic function in the legs.  Id.  Dr. Galyon noted that her x-rays were "quite stable in terms of alignment and appearance of grafting hardware system L4-S1."  Id.  He discussed with Wasser the importance of weight loss because her stature was creating "too much musculoskeletal stress on her spinal architecture."  Id.  There were no surgical options available, in Dr. Galyon's opinion.  Id.

## II.  Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "'more than a mere scintilla,'" meaning that in the record one can find "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g); see Halloran, 362 F.3d at 31.

### B.  Determination of Disability

"Every individual who is under a disability. . . shall be entitled to a disability. . . benefit . . . ."  42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)) (additional citation omitted).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

<u>Berry</u>, 675 F.2d at 467.  The plaintiff bears the initial burden of proof to establish each of the first four steps.  <u>DeChirico v. Callahan</u>, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing <u>Berry</u>, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  <u>Id.</u> at 1180 (citing <u>Berry</u>, 675 F.2d at 467).

### C.  ALJ Greener's Findings

Wasser, represented by counsel, testified at the hearing held on August 13, 2013.  T. 34-51.  Using the five-step sequential evaluation, ALJ Greener found that Wasser (1) had not engaged in substantial gainful activity since April 25, 2012, the alleged onset date; (2) had the following severe medically-determinable impairments: degenerative disc disease of the lumbar spine with status post fusion at L4-S1, and obesity; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintained

> the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), which involves lifting and/or carrying ten pounds occasionally and less than ten pounds frequently, standing and/or walking for two hours in an eight-hour workday, and sitting for six hours in an eight-hour workday.  She can occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  She can also engage in frequent use of her left non-dominant hand for fingering and feeling, but has no limitations for use of her dominant right hand for manipulative activities.

and, thus; (5) given her age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy.  <u>Id.</u> at 13-19.

-13-

## D. Wasser's Contentions

Wasser contends that the ALJ (1) erred in assigning little weight to the opinions of her treating physicians, Drs. Wasco, Galyon and Khan; (2) substituted the ALJ's own opinion for the opinion of the medical opinions of record; (3) determined an RFC that was unsupported by any medical opinions in the record; and (4) failed to properly consider Wasser's obesity in determining the RFC. See Dkt. No. 16.

## E. Treating Physician Rule

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991). Generally, more weight is given to a treating source. Under the regulations, a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant

-14-

factors." Schaal, 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

Here, Wasser claims that the ALJ failed to properly weigh the treating physicians' opinions when formulating Wasser's RFC. Dkt. No. 16 at 11-17. Additionally, Wasser argues that the ALJ substituted her own opinion for that of the medical opinions of record, and that the ALJ's RFC formulation is unsupported by any medical opinions in the record. Id. at 17-22.

"[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)). Additionally, the ALJ may not substitute his or her own opinion "or view of the medical proof for the treating physician's opinion." Shaw, 221 F.3d at 134 (citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)).

Dr. Wasco's opinion, dated January 9, 2013, indicated that Wasser had severe functional limitations due to her chronic back pain. T. 389, 391. Likewise, Dr. Khan's opinion indicated severe functional limitations. Id. at 480-82. In assigning only limited weight to these treating physician opinions, the ALJ explained that the limitations set forth in the opinions were contradicted by the objective medical evidence. Id. at 16. However, a more careful reading of the records cited by the ALJ shows little support for the ALJ's decision not to afford controlling weight to Dr. Wasco or Dr. Khan's opinion.

For the most part, the ALJ cites to the treatment records of Dr. Galyon in determining that Dr. Wasco and Dr. Khan's opinions were entitled to little weight. T. 16. In May 2012, Dr. Galyon noted that Wasser had an acceptable range of motion post-surgery, and that her incision was healing. Id. at 252. However, thirteen days later, Wasser reported that her condition was worsening, and that she was in more pain. Id. at 250. Dr. Galyon noted that she had a small area of incomplete healing on her incision. Id. at 251. He also ordered her to limit her activity. Id. Physical therapy notes from May 2012 indicated that Wasser still had "severely limited functional abilities." Id. at 324. Although physical therapy notes indicated that her ability to perform functional abilities improved in June and July 2012, the last physical therapy note issued on August 30, 2012 indicated that Wasser had "progressively worsening cervical pain" and that she suffered from symptoms of cervical spinal stenosis. Id. at 352, 376-77. Despite these notes detailing Wasser's actual course of treatment, the ALJ only notes that Wasser's physical therapist opined that she had "excellent rehab potential." Id. at 16.

In July 2012, Dr. Galyon noted that Wasser's post-operative status was improving, and that her x-rays appeared stable. T. 403. He further noted that she had no complaints of radiating pain in her legs, and that she suffered from only a mild degree of back discomfort. Id. In August 2012, Dr. Galyon stated—and the ALJ noted that—he anticipated Wasser's improvement so that she could rejoin the workforce. Id. at 16, 405. However, Dr. Galyon also stated that she was "still disabled" with limited flexion and extension, and reduced strength and sensation in her lower extremities. Id.

In December 2012, Wasser reported low back pain. T. 410. She also reported bilateral hip pain and numbness and tingling in her legs. Id. Dr. Galyon noted that her

lumbar range of motion was limited by pain, but that her x-rays were stable.  Id. at 411-12.

Wasser's complaints of pain continued in January 2012.  Id. at 413.  In February 2013, Dr.

Galyon noted that her x-rays were stable, but opined that her obesity was causing too much

musculoskeletal stress on her spinal architecture.  Id.

Office treatment notes from Dr. Wasco also outline Wasser's ailments, although they

are not discussed in detail by the ALJ.  On March 6, 2012, Dr. Wasco noted that Wasser's

x-rays showed mild right and left hip degenerative joint disease, with degenerative arthritis

of the LS spine.  T. 285.  An MRI revealed mild-to-moderate lumbosacral hyperlordosis, L5-

S1 level bilateral L5 spondylosis, anterior listhesis of L5 on S1, and degenerative arthritis of

L2-L3.  Id.  Dr. Wasco noted that Wasser had discomfort moving from a chair to the

examination table, and that her gait was mildly affected due to pain.  Id.  A straight leg raise

test was positive on the right side, and Wasser exhibited decreased sensation in the distal

toes of her right foot.  Id.  However, her deep tendon reflexes and cognition were intact.  Id.

After Wasser's back surgery, Dr. Wasco noted, on June 19, 2012, that Wasser was

"still having difficulty getting around."  T. 279.  She was also suffering from acute left

shoulder pain, and exhibited a "decreased range of motion with palpable discomfort also in

the AC joint," and an MRI taken the next day revealed a partial thickness tear, joint effusion,

and tendonitis.  Id. at 279, 470-71.  On July 31, 2012, Dr. Wasco noted that Wasser

"obviously" had difficulty moving from a sitting to standing position.  Id. at 441.  However, Dr.

Wasco also noted that she had free range of motion in her spine, although she also

exhibited a decreased range of motion in her left shoulder, and some subjective numbness

in the distal fourth and fifth digits.  Id.

On September 18, 2012, Dr. Wasco stated that Wasser was suffering from "chronic

pain syndrome" along with degenerative disc disease in her lumbosacral spine. T. 438. Additionally, he noted that an MRI of Wasser's back revealed cervical disk disease. Id. Wasser's cognition was intact, but her gait was "affected because of her arthritis." Id.

On January 9, 2013, Dr. Wasco noted that, despite her back surgery, Wasser still had "persistent pain" in her back that radiated down her legs, also causing numbness. T. 425. He stated that Wasser suffers from "severe cervical disk disease" radiating to the acapular and shoulder regions. Id. He opined that she is "totally disabled." Id. An objective physical examination showed that her cognition was intact, but her gait was affected because of her low back issues. Id. She showed a decreased range of motion in her cervical spine, along with a palpable nuchal spasm and palpable discomfort. Id. She also showed a decreased range of motion in her lumbosacral spine, extension and flexion with discomfort, and subjective pain and numbness in her lower extremities. Id. On March 19, 2013, Wasser reported that the steroid injections she received from her pain management physician improved her condition, although her gait continued to be affected by her back issues. Id. at 422.

Dr. Khan, Wasser's pain management treating physician, noted on September 25, 2012 that Wasser suffers from "intractable back pain that is unresponsive to conservative treatment." T. 489. Her pain continued during subsequent visits, although Dr. Khan noted that her urine drug tests were positive for marijuana and cocaine. See id. at 494-99. Dr. Khan performed spinal injections on March 29, 2012, September 25, 2012, March 6, 2013, April 11, 2013, and May 28, 2013. Id. at 487-90, 500-03, 508-09. On May 28, 2013, Dr. Khan noted that Wasser continued to have upper lumbar and thigh pain. Id. at 504. He noted that her symptoms were aggravated by bending, daily activities, extension, flexion,

and lifting.  Id.  The steroid injections and pain medications alleviated her pain.  Id.  Upon physical examination, her gait was antalgic, and she showed tenderness in her paraspinal and lumbar regions.  Id. at 506.  A straight leg raise test was positive for back pain.  Id.  She also showed limited flexion, extension, and ability to bend.  Id.

As outlined above, it is evident that both Dr. Khan and Dr. Wasco interpreted their own objective findings as indicative of Wasser's substantial functional limitations.  Indeed, Dr. Wasco opined that Wasser had severe limitations of her functional capacity, and that she is limited by her pain.  T. 389.  The ALJ's decision to grant limited weight to Dr. Wasco's opinion is unsupported by substantial evidence, and also fails to properly apply the treating physician rule.

The treating physician rule requires the ALJ to assess certain factors before assigning less than controlling weight to the opinion of a treating physician.[4]  Here, the ALJ fails to discuss Dr. Wasco's own treatment notes, nor does the ALJ discuss the frequency, length, nature, and extent of Dr. Wasco's treating relationship with Wasser.  See T. 16.  Moreover, the ALJ largely cites to Dr. Galyon's treatment notes to discredit Dr. Wasco's opinion, but cherry picks only the medical records that support the RFC determination, while failing to cite to the substantial amount of medical records from both Dr. Galyon and Dr. Wasco's own treatment notes that indicate more severe functional limitations.  Zayas v.

---

[4]     These factors, known as the "Halloran factors," are:

> (1) the frequency of examination and length, nature, and extent of the treatment relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist, and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32.

<u>Colvin</u>, No. 15-CV-6312-FPG, 2016 WL 1761959, at *4 (W.D.N.Y. May 2, 2016) ("An ALJ may not "cherry pick" from a medical opinion, *i.e.*, he or she may not credit evidence that supports administrative findings while ignoring conflicting evidence from the same source."); <u>Royal v. Astrue</u>, No. 5:11-456, 2012 WL 5449610, at *6 (N.D.N.Y. Oct. 2, 2012) ("In effect, [the ALJ] "cherry picked" the evidence, relying on some statements to support his conclusion, while ignoring other substantive detail to the contrary from the same sources."). This does not satisfy the substantial evidence standard, and requires remand. <u>Tim v. Colvin</u>, No. 6:12-cv-1761 (GLS/ESH), 2014 WL 838080, at *8 (N.D.N.Y. Mar. 4, 2014).

The ALJ further failed to properly apply the treating physician rule to Dr. Khan's opinion. She neglected to discuss the applicable factors in assessing the weight to be assigned to his opinion as a treating physician. <u>See</u> T. 16; p. 9 n.4 <u>infra</u>. Failure to properly apply the treating physician rule constitutes reversible error, requiring remand. <u>See</u> <u>Crossman v. Astrue</u>, 783 F. Supp. 2d 300, 308 (D. Conn. 2010) (stating that the ALJ must "explicitly consider" several factors before assigning less than controlling weight to the opinion of a treating physician) (internal quotation marks omitted).

Lastly, the ALJ's reliance on the opinion of Dr. Sheikh to support the finding that Wasser can perform sedentary work was inappropriate. Dr. Sheikh assessed marked limitations for bending, walking, carrying, lifting, and squatting, and mild limitations for fine motor activity with the left hand. T. 298. He did not give any opinion as to Wasser's ability to sit or stand. Dr. Khan, Wasser's treating physician, opined that Wasser would only be able to sit for four hours, and stand for one hour, during an eight-hour workday.[5] <u>Id.</u> at 482.

---

[5] "Sedentary work [] generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." <u>Perez</u>, 77 F.3d at 46 (citing 20 C.F.R. § 404.1567(a)) (additional citation omitted).

It seems that the ALJ reconciles this disparity in opinions by giving great weight to the opinion of Dr. Blando, a state agency medical consultant. See id. at 16. A state agency single decision maker opined that Wasser could stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. Id. at 58. However, this opinion was rendered on August 27, 2012, almost a full year before Wasser's hearing before the ALJ. In a musculoskeletal review dated November 12, 2012, Dr. Blando simply affirmed the limitations opined by the single decision maker. Furthermore, it is not evident from the record that Dr. Blando even reviewed Wasser's medical records, as she simply affirms an assessment written by a disability examiner, Wendy Chappell. Id. at 78-79. Based on the conflicting treatment records and opinions rendered by Wasser's treating physicians, there is no substantial evidence in the record to support Dr. Blando's opinion. Therefore, the ALJ's rejection of the sitting and standing limitations opined by Dr. Khan is unsupported by any medical evidence in the record. This also constitutes reversible error requiring remand. See Jermyn v. Colvin, No. 13-CV-5093 (MKB), 2015 WL 1298997, at *20. (E.D.N.Y. Mar. 23, 2015) (remanding where the RFC determination was unsupported by medical evidence in the record); Whitney v. Astrue, No. 09-CV-0484, 2010 WL 3023162, at *4 (W.D.N.Y. July 29, 2010) (remanding where the ALJ relied on the "vague" opinion of a non-treating consultative physician in determining the claimant's RFC) .

For the reasons stated above, this matter requires remand. On remand, the ALJ is directed to reassess Wasser's RFC, and properly apply the treating physician rule to the opinions of Wasser's treating physicians, Drs. Galyon, Wasco, and Khan.

Since remand is necessary based on the errors described above, the Court need not address Wasser's remaining contention that the ALJ failed to properly consider Wasser's

-21-

obesity in determining the RFC. Without expressing an opinion as to the merits of this claim, the ALJ is further directed to consider Wasser's obesity when making a new determination.

## III. Conclusion

Having reviewed the administrative transcript and the ALJ's findings, the Court concludes that the ALJ's determination is not supported by substantial evidence. Remand for further administrative action consistent with this Memorandum-Decision and Order is needed. Accordingly, it is hereby

**ORDERED** that plaintiff's motion for judgment on the pleadings (Dkt. No. 16) is **GRANTED**. The matter is remanded to the Commissioner for additional proceedings consistent with the above, pursuant to sentence four of 42 U.S.C. 405(g); and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 17) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of the Memorandum Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:     September 23, 2016
           Albany, New York

Christian F. Hummel
U.S. Magistrate Judge